USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/6/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

CAN'T LIVE WITHOUT IT, LLC D/B/A
S'WELL BOTTLE,

       Plaintiff,

       -v-

ETS EXPRESS, INC.,

       Defendant.

------------------------------------------x

17-cv-3506 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

Plaintiff Can't Live Without It, LLC ("S'well") has brought six claims against defendant ETS Express, Inc. ("ETS"). ETS manufactures the Force and Swig Bottles, which have the exact same shape as plaintiff's S'well and S'ip Bottles, respectively. ETS has moved for summary judgment dismissing all six of S'well's claims: (1) trade dress infringement in violation of the Lanham Act; (2) false designation of origin and unfair competition in violation of the Lanham Act; (3) trade dress infringement under New York common law; (4) unfair competition under New York common law; (5) deceptive acts and practices in violation of New York General Business law § 349, and (6) false advertising in violation of New York General Business Law § 350. ETS has also moved for summary judgment on its counterclaim seeking cancellation of the trade dress registrations for the S'well and S'ip Bottles. S'well, in turn, has moved for summary judgment as to liability on its

1

second and fourth claims, but only with regard to ETS's alleged use of S'well's trademarked name, not S'well's trade dress rights.

For the reasons set forth below, the Court grants defendant's motion for summary judgment dismissing plaintiff's second claim (false designation of origin and unfair competition in violation of the Lanham Act), fifth claim (deceptive acts and practices in violation of New York General Business law § 349), and sixth claim (false advertising in violation of New York General Business Law § 350). The Court otherwise denies defendant's motions, and also denies plaintiff's motion.

The relevant facts, undisputed except where noted, are as follows:

S'well was founded in 2010 by Sarah Kauss, who remains its CEO. Defendant ETS Express, Inc.'s Response to Plaintiff's Rule 56.1 Statement of Purported Undisputed Facts ("ETS 56.1 Resp.") ¶ 1, ECF No. 65. S'well manufactures water bottles and holds various trademarks registered with the United States Patent and Trademark Office ("PTO"), including for the words "S'well" and "Swell," as well as the stylized mark **S'well**. Id. ¶ 5.

S'well's signature product is the S'well Bottle, id. ¶ 2, which came to market in 2010, id. ¶ 9. All S'well Bottles have the "S'well" mark printed on their sides. Plaintiff's Response and Counterstatement to ETS Express, Inc.'s Statement of Material Facts Not in Dispute ("S'well 56.1 Resp."), ¶ 44, ECF No. 69.

2

S'well registered the S'well Bottle's trade dress (its three-dimensional shape and cap, in combination) with the PTO Supplemental Register in July 2013 and the PTO Principal Register in January 2017. ETS 56.1 Resp. ¶ 6. S'well has since litigated against several companies it viewed as having infringed these trade dress rights. See Can't Live Without It, LLC d/b/a S'well Bottle v. RTIC Coolers, LLC, RTIC Drinkware, LLC, RTIC Web Services, LLC, and John Doe LLCs 1-5, 1:17-cv-03530 (S.D.N.Y. May 11, 2017); Can't Live Without It, Inc. d/b/a S'well Bottle v. Shanghai2008 (HK) Trading Ltd., 1:16-cv-09520 (S.D.N.Y. Dec. 12, 2016).

The S'well Bottle has been very successful, obtaining substantial amounts of free, unsolicited media coverage, selling millions of bottles and an increasing number each year, and generating millions of dollars in income. ETS 56.1 Resp. ¶¶ 13-18. S'well sells its bottles (a) directly to consumers on its website, (b) to retailers who then sell the bottles in their stores, and (c) through S'well's custom program, in which an imprint of a company's name or logo is added to the bottle and the company then resells or gives away the bottles. Id. ¶ 22. S'well has spent a great deal of money on advertising and marketing its bottles and has collaborated with various philanthropic organizations, trade shows, festivals, and other events and tastemakers to further develop its brand. Id. ¶ 26. As a result,

3

S'well is well known compared to other water bottle brands. Id. ¶ 27.

ETS is a drinkware company that was founded in 1985. S'well 56.1 Resp. ¶ 1. ETS has had success selling various kinds of its own water bottles that are "patterned after" retail brands. Declaration of Robert Penchina in Support of Plaintiff's Motion for Summary Judgment dated November 20, 2017 ("Penchina Decl."), ECF No. 49, Ex. 6, Deposition of Adam Stone ("Stone Dep.") 101:23-02:2. The Force Bottle is one of ETS's most popular products and is shaped identically to the S'well Bottle. ETS 56.1 Resp. ¶¶ 32-34. ETS first placed a factory order for a Force Bottle in May 2014. Id. ¶ 57. ETS characterizes itself as operating in the "promotion products market" rather than the retail market, meaning it fulfills orders placed by intermediaries for custom-printed products and the intermediaries then sell those products to businesses that give them away as promotions. Id. ¶¶ 42-43. These intermediaries sell a wide variety of products and do not specialize in drinkware. Id. ¶ 44. ETS does sell Force Bottles directly to some retailers — including, at least, college bookstores and a coffee shop chain with locations throughout California. Id. ¶ 47. Additionally, some distributors sell to retailers who sell Force Bottles to end-users either online or in retail stores. Id.; Penchina Decl., Ex. 23.

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). There is no genuine dispute if, "drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The movant bears the burden of showing that there is no genuine dispute of material fact." Id. at 256.

## I.   Trade Dress Violation under the Lanham Act (First Cause of Action) and under New York Common Law (Third Cause of Action). Defendant's Counterclaim for Cancelation.

Section 32 of the Lanham Act, in relevant part, holds liable any person who "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods" when "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).[1] "[T]o succeed in a Lanham Act suit for trademark infringement, a plaintiff has two obstacles to overcome: the plaintiff must prove that its mark is

---

[1] Before 1962, an alleged infringer's use of its mark in commerce had to be likely to deceive "purchasers as to the source of origin of such goods or services," but that portion was then deleted "since the provision actually relates to potential purchasers as well as to actual purchasers." S. Rep. No. 87-2107 (1962), as reprinted in 1962 U.S.S.C.A.N. 2844, 2847.

5

entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with plaintiff's mark." Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp., 991 F.2d 1072, 1074 (2d Cir. 1993). "The analysis for trade dress infringement is the same under both the Lanham Act and New York State common law." Sports Traveler, Inc. v. Advance Magazine Publishers, Inc., 25 F. Supp. 2d 154, 166 (S.D.N.Y. 1998).

## A. Validity of the Trademark and Defendant's Counterclaim for Cancelation

The Lanham Act only protects nonfunctional, distinctive trade dress. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 775 (1992). If the trade dress is either functional or not distinctive, then cancelation of the mark is appropriate. See 15 USC § 1064(3) (authorizing cancelation "if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered, or is functional"). S'well's mark is presumptively distinctive and nonfunctional because it is registered with the PTO. See 15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark"). "As a result, when a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of [the] mark's protectibility by a

6

preponderance of the evidence." Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999).

"[P]roduct-design trade dress can never be inherently distinctive," as product design, such as the shape of a bottle, always serves a function beyond identifying the source of the product. Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 214-15 (2000). To become distinctive, a product design trade dress must acquire a secondary meaning. Id. Trade dress has a secondary meaning if, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982). In evaluating this issue, courts look to such factors, inter alia, as advertising expenditures, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize the mark, and length and exclusivity of the mark's use. Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1041 (2d Cir. 1992).

Here, defendant's sole argument against distinctiveness is that consumers cannot possibly associate the bottle shape here at issue with any single source because so many different businesses manufacture similarly shaped bottles. ETS provides declarations from various employees who state that they purchased S'well-like bottles from various stores and websites, providing pictures, descriptions, and receipts. See Defendant ETS Express, Inc.'s

Local Rule 56.1 Statement of Material Facts Not in Dispute ("ETS 56.1 Stmt."), ¶¶ 23-25, 42, ECF No. 47. ETS identifies 130 different sources of water bottles that have the same shape as the S'well Bottle.

Defendant posits that, as a matter of law, if "the total number of such different sources exceeds 20, the alleged mark is generic because it cannot indicate that it emanates from a single source." ETS Express, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment ("ETS Mem.") at 5, ECF No. 57. But no such numeric rule exists. If, for example, one source has such a large market share and strong brand awareness that the public strongly associates its mark with that brand, consumers will likely assume that products bearing that mark are associated with that brand, regardless of the number of "knockoff" manufacturers. The number of manufacturers is therefore a relevant, but not determinative factor.[2]

---

[2] The cases ETS cites do not support the hard rule it suggests. In EFS Marketing, Inc. v. Russ Berrie & Co., the defendant did not "contend that its troll dolls had acquired distinctiveness through secondary meaning," which would have been a tall order because the dolls were "virtually indistinguishable" from a "public domain doll." 76 F.3d 487, 490-91 (2d Cir. 1996). In Mana Prod., Inc. v. Columbia Cosmetics Mfg., Inc., a cosmetic company sought trademark protection for its compact cases because they were black, but it adduced no evidence of secondary meaning beyond advertising expenses and one declaration from one customer. 65 F.3d 1063, 1071 (2d Cir. 1995). This evidence was particularly insufficient because "black is as common a color for a makeup case as brown is for a paper bag." Id. In Malaco Leaf, AB v. Promotion In Motion, Inc., the Court held that

While ETS, in its motion seeking summary judgment dismissing S'well's first and third claims largely relies on a non-existent statistical rule, S'well, by contrast, submits substantial evidence suggesting that the public in fact does associate this particular shape with S'well, including undisputed, significant levels of advertising expenditures, sales success, and unsolicited media coverage. ETS 56.1 Resp. ¶¶ 13-20. Moreover, ETS salespeople in emails with distributors themselves referred to the Force Bottle as a "S'well knockoff," Penchina Decl. Exs. 11, 12; a "swell like option," Declaration of Paul J. Safier in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment dated December 4, 2017 ("Safier Decl."), ECF No. 62, Ex. 14; "S'well-like," id., Ex. 15; and "the ones that look like Swell," id., Ex. 16. Online retailers have similarly advertised Force Bottles to the public as being similar to S'well Bottles. See id., Exs. 20, 21. These comparisons would be meaningless if the audience did not associate the shape with the brand. See Cartier, Inc. v. Four Star Jewelry Creations, Inc., 348 F. Supp. 2d 217, 231 (S.D.N.Y. 2004) (use of "such terms as 'Cartier style,' 'Tank style' or 'Panthere style'" to advertise watches supported finding of secondary

---

"evidence of extensive third-party use supports a finding that the Swedish Fish design is generic," but also that "fish-shaped candies were among the top four shapes sold in the gummy industry in the late 1990s," and that the plaintiff had not policed its trade dress rights for decades. 287 F. Supp. 2d 355, 364 (S.D.N.Y. 2003).

meaning). Thus, at a minimum, a genuine dispute exists as to whether S'well's trade dress has acquired a secondary meaning, thereby precluding summary judgment in ETS's favor on this issue.

Product design with a secondary meaning is nonetheless insufficient to sustain plaintiff's first and third claims if the protected design is functional, i.e., if it serves some useful purpose beyond identification of source and there are no marketable, alternative designs that would achieve the same end. See Brandir Int'l, Inc. v. Cascade Pac. Lumber Co., 834 F.2d 1142, 1148 (2d Cir. 1987). The Latham Act is meant to protect consumers from confusion, not to permit monopoly pricing for functional items. See Qualitex Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 164-65 (1995).

ETS argues that the registered configurations of both the S'well and S'ip Bottles are functional because they are "the most efficient container shape[s] from which to drink." ETS Mem. at 10. ETS cites material S'well itself submitted to the PTO in support of its registrations to argue that both bottles contain "mouths" that are big enough for ice cubes but small enough for "drip-free sipping" and are located in the center of the bottle, so users never need to rotate the bottle to begin drinking. Id. at 10-11. ETS also asserts that the circular shape is the "strongest and the easiest to make," and that the bottles' smooth tapering at a relatively shallow angle from the base to the mouth permits the

bottles to be emptied completely with relatively minor tilts. Id. at 11-12. The alternative design – straight sides with a sharp angle just before the mouth – creates a "catch basin," so that the liquid in the bottle, rather than smoothly flowing out, is trapped in the depression where the angle changes until the bottle is tilted further, at which point it comes rushing out all at once, leading to spills and other dangers. Id. at 12-13.

ETS, however, cites no evidence in the section of its brief making these assertions, and that by itself is enough to defeat these assertions for purposes of a summary judgment motion. Several propositions on which they rely, moreover, are far from self-evident. ETS states that manufacturing a circular shape is the easiest and cheapest option, but a rectangular shape might likely be easier to stack and ship. Cf. Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 20 (7th Cir. 1992) (nail polish manufacturer arguing that square container was functional for these reasons). The founder of S'well also said in her declaration that she made several aesthetic choices when she designed the bottles that she knew would be more expensive. Declaration of Sarah Kauss dated December 4, 2017 ¶ 5, ECF No. 63.

Furthermore, ETS offers no evidence suggesting that no other designs could have these same functional benefits. S'well has not trademarked all water bottles with gently sloping sides. Indeed, ETS's argument that both the S'ip and S'Well Bottles have ideal

11

shapes, despite the two being shaped differently, suggests that these benefits may be available in other shapes as well. And ETS says nothing about the distinctive bottle cap, which is part of S'well's trade dress. Nor is it clear that S'well and S'ip Bottles have achieved the perfect mouth size. (How many ice cubes will not fit a smaller bottle mouth? How much more spilling does a bigger bottle mouth risk?)

To be sure, container shapes are often functional, and "society is better served if functional containers . . . remain available for use among competitors. To the extent this causes a modicum of confusion of the public, it will be tolerated." In re Water Gremlin Co., 635 F.2d 841, 844 (C.C.P.A. 1980). But ETS has not offered sufficient evidence to show that the function the instant combination of design elements serves is otherwise unavailable.

Although the genuine dispute that therefore exists as to whether S'well's trade dress rights are distinctive and non-functional is insufficient in itself to end the inquiry regarding defendant's motion for summary judgment on plaintiff's first and third causes of action (see the next section), it is sufficient to deny defendant's motion for summary judgment on its counterclaim seeking cancelation of plaintiff's marks. That motion is therefore denied.

## B. Likelihood of Confusion

Even if its mark is valid, a plaintiff cannot succeed on claims of infringement under the Lanham Act or parallel New York State law unless the defendant's use of the mark tends to cause confusion. The Court therefore considers whether customers or potential customers who see the allegedly infringing product (the Force Bottle) are likely to either confuse it with the protected product (the S'well Bottle) or believe that S'well is somehow associated with Force Bottle. In deciding whether a product is likely to confuse consumers about its origins, courts in this circuit examine the eight factors famously enumerated by Judge Friendly in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961):

> (1) strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap" . . . ; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers.

Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 478 (2d Cir. 1996). "If a factual inference must be drawn to arrive at a particular finding on a Polaroid factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment." Id.

13

As discussed above, S'well has adduced significant evidence that its mark is distinctive and strong, despite the fact that many other manufacturers make similar bottles. And defendant concedes that the two products are very similar. ETS Mem. at 6. These first two critical factors therefore weigh against granting defendant's motion.

ETS's principal argument is that S'well's claim fails on the third and eighth Polaroid factors. According to ETS, Force Bottles and S'well Bottles are sold in separate markets to sophisticated consumers who would not confuse them. ETS submits a declaration from an expert who opines that distributors that purchase Force Bottles from ETS and the businesses that order those bottles from the distributors are unlikely to be confused about the bottles they purchase. Declaration of Michael W. Carwin in Support of Defendant ETS Express, Inc.'s Motion for Summary Judgment dated November 20, 2017 ("Carwin Decl."), Ex. 9 Expert Report of Jacoby Jacoby, Ph.D. ("Jacoby Rep.") ¶¶ 22-25.

However, this report involved no empirical research or data analysis and consists largely of unsupported speculation masquerading as expert opinions. See, e.g., Jacoby Rep. ¶ 25(b) (asserting that "'unit price' of the bottles is likely to be a much more important decision factor for buyers at End User Companies than is 'source'."). Plaintiff, by contrast, has adduced evidence of distributors specifically requesting "S'well Bottles"

14

from ETS, which appeared to fill the orders with Force Bottles without correction. See, e.g., Penchina Decl. Ex. 41. A reasonable juror could therefore disagree with the expert's conclusions. Furthermore, ETS and S'well undisputedly do participate, to some extent, in the same markets. Specifically, 10-15% of S'well's business is in the promotional market. ETS 56.1 Stmt. ¶ 21. And ETS sells directly to at least some retailers and some distributors, who then sell Force Bottles to retailers or directly to end-users online. ETS 56.1 Resp. ¶ 47.[3]

ETS also ignores the possibility of post-sale confusion among the end-consumers of Force Bottles. See Jacoby Rep. ¶ 22 (assuming that only the confusion of immediate buyers is relevant).[4] "[E]ven if the direct purchaser of these goods were unlikely to confuse the source of the product because of the clearly delineated channels of trade, this does nothing to alleviate post-sale confusion as to the source the goods." T. Anthony, Ltd. v.

---

[3] S'well claims that it is working to "bridge the gap" by expanding its presence in the promotions market, but it provides no evidence to support this contention. Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 16-17, ECF No. 60. The fourth Polaroid factor therefore weighs in favor of ETS. This factor matters less, however, where there is already significant overlap between the parties' markets.

[4] Neither party has put forth any argument regarding whether "potential purchasers would be misled into an initial interest" in Force Bottles, which would suffice to work a trademark injury. Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 260 (2d Cir. 1987). The Court has therefore not considered this possibility.

Malletier, No. 93-cv-6900, 1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993). It does not matter if the confused customers are not purchasing directly from the alleged infringer. See Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 108 (2d Cir. 2000) (recognizing post-sale confusion under the Lanham Act because, among other reasons, "the public may be deceived in the resale market if it requires expertise to distinguish between an original and a knockoff"). Nor does it matter, as ETS argues, that the two bottles are of the same physical quality, particularly where, as here, there is evidence that they are not of the same expressive quality. See, e.g., Declaration of Sarah M. Kauss dated November 19, 2017, ECF No. 55, Ex. B3 (magazine article describing S'well Bottles as "suddenly a feverish must-be-associated-with-thing among a certain stylish, in-the-know set"). The purchase of one product under the mistaken belief that it is another product is a prototypical harm against which the Lanham Act protects.

S'well has also pointed to several examples of actual downstream confusion. At least one retailer mislabeled Force Bottles as "Swell Bottles" on its shelves, Safier Decl. Exs. 28-29, and several consumers have contacted S'well customer service in the mistaken belief that they had S'well Bottles, when in fact they had Force Bottles or, perhaps, similar bottles from other

16

brands, Penchina Decl. Exs. 51-53.[5] S'well also submitted a report from an expert who conducted an internet survey that shows that 59% of S'well's target demographic — female potential purchasers of stainless steel water bottles — associate the shape at issue with S'well. Safier Decl. Ex. 22, Expert Report of Robert L. Klein at 14. This expert also calculated an overall net confusion rate of 26.6% between the S'well and Force Bottles. Id. at 29-30. ETS does not address this expert's findings. And even if it had, the Court, on summary judgment, must draw every reasonable inference in the non-moving party's favor. For purposes of defendant's motion, the fifth Polaroid factor therefore favors S'well.

The sixth Polaroid factor is "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." Lang v. Ret. Living Publ'g Co., Inc., 949 F.2d 576, 583 (2d Cir. 1991) (citation omitted). ETS asserts that it did not know about S'well or the S'well Bottle when it decided to make the Force Bottle. ETS 56.1 Resp. ¶ 58. According to ETS's CEO, ETS decided to make the Force Bottle "in response to requests from its distributors who requested that ETS supply them with a

---

[5] While an argument might be made that these items are inadmissible hearsay, ETS, in its otherwise exhaustive response to S'well's 56.1 Statement, failed to object to them on this ground. See ETS 56.1 Resp. ¶¶ 47; 71. Moreover, even if the Court were to disregard these items, that would not materially alter any of the Court's conclusions herein.

17

cola type bottle that was being supplied by competitors of ETS,"
and ETS only learned about S'well after it began doing research
about such a bottle. Declaration of Michael W. Carwin in Support
of ETS Express, Inc.'s Opposition to Plaintiff's Partial Motion
for Summary Judgment dated December 4, 2017 ("Carwin Opp. Decl."),
ECF No. 66, Ex. 21, Declaration of Sharon Eyal ¶ 2. Given, however,
the many years of the S'well Bottle's prominent existence before
ETS decided to make the Force Bottle, the credibility of the CEO's
assertion is still a genuine and disputed issue.

Moreover, even if ETS initially decided to make a "cola type
bottle" before it knew about S'well, the evidence tends to show
that, before the Force Bottle was actually made, ETS learned of
the S'well Bottle. Specifically, ETS employee Adam Kovar sent a
list of the available volumes of S'well Bottles to ETS CEO Sharon
Eyal and ETS CFO Taly Eyal in an email dated May 2, 2014, just
before ETS finalized its first order of Force Bottles. Penchina
Decl. Ex. 28. The evidence also tends to show that ETS made changes
to the Force Bottle for the express purpose of making it more
similar to the S'well Bottle. In a 2015 email exchange with
employees of a factory that makes both the Force and S'well
Bottles, Kovar told a factory employee, "[P]lease look at the
S'well bottle/lid you make. Ours should be equally as defined as
theirs." Penchina Decl. Ex. 30. Sharon Eyal then added, "We really
need to match the lid on the left," referring to the picture of

the S'well Bottle. Id. Kovar later distributed a chart to ETS staff highlighting changes and noting that "the newer version is identical to S'well's (lid and base)." Penchina Decl. Ex. 31.

ETS also has a "Retail Brands Guide" that compares its products to retail products. See Penchina Decl. Ex. 26 (the guide). Although ETS contends this was made for internal use, at least some ETS representatives distributed it to customers. See, e.g., Stone Dep. 120:13-25 (regional sales representative testifying that he "blasted" the guide out to "probably . . . [a] [h]undred, hundred plus" clients). This catalog compares the Force to the S'well Bottle, with the description and picture of the S'well Bottle taking up almost the entire page and comparably tiny pictures of the Force Bottle at the bottom. Penchina Decl. Ex. 26 at 9. In a deposition, one ETS salesperson said it was "fair" to say that ETS tried to "get the distributor to offer [customers] a Force as the equivalent to the . . . S'well" in which the customer was interested because the retail brands "invest in marketing and create interest." Stone Dep. 161:24-162:7.

There is thus sufficient evidence for a reasonable juror to find that ETS intentionally made its Force Bottle look exactly like the S'well Bottle because ETS meant to take advantage of the strength of S'well's mark. The sixth Polaroid factor therefore militates against granting defendant's motion.

The seventh factor is the quality of the goods. A marked difference in quality "tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user." Savin Corp. v. Savin Grp., 391 F.3d 439, 461 (2d Cir. 2004). But, for reasons relating to the positions they take on other claims, the parties take positions on this seventh factor seemingly at odds with their interests. Specifically, ETS argues that the products are similar (which would make confusion more likely) while S'well argues that the Force Bottle is inferior (which would make confusion less likely). While this issue is addressed below in relation to S'well's deceptive practices and false advertising claims under New York law, for immediate purposes the most that can be said is that there is no evidence that Force Bottles are inferior products.

For all the foregoing reasons, consideration of the Polaroid factors demonstrates that there is, at a minimum, a genuine dispute regarding whether it is likely that purchasers and potential purchasers will confuse Force Bottles for S'well Bottles. Defendant's motion for summary judgment on plaintiff's claims for trade dress infringement in violation of the Lanham Act and New York common law is therefore denied.

## II. Deceptive Acts and Practices (Fifth Cause of Action) and False Advertising (Sixth Cause of Action) Under New York Law

ETS has also moved for summary judgment on S'well's claims under Sections 349 and 350 of the New York General Business Law. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." Id. § 350. To succeed under either section, a plaintiff must show "that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (quoting Koch v. Acker, Merrall & Condit Co., 967 N.E.2d 675 (N.Y. 2012)).

To be "consumer-oriented," the practice must threaten an injury "to the public interest over and above ordinary trademark infringement or dilution." Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd., No. 07-cv-6959, 2009 WL 4857605, at *8 (S.D.N.Y. Dec. 14, 2009) (internal quotation marks, citation, and emphasis omitted). Although competing businesses have standing to sue under these provisions, the provisions are fundamentally consumer protection devices, so "the gravamen of the complaint

21

must be consumer injury or harm to the public interest," not mere competitive disadvantage. Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995) (internal quotation marks and citation omitted).

ETS argues that plaintiff fails to allege any public injury beyond the confusion generally associated with trademark infringement. S'well responds that it has shown a genuine dispute of fact regarding whether ETS's products are of lower quality than the S'well Bottle, and that the possibility of confused consumers purchasing an inferior product suffices to fulfill the "consumer-oriented" element of these claims.

Courts in this circuit differ regarding the severity of the threat to the public that Sections 349 and 350 require. Some district courts have required "significant ramifications for the public at large," Shred-It USA, Inc. v. Mobile Data Shred, Inc., 228 F. Supp. 2d 455, 465 (S.D.N.Y. 2002) (internal quotation marks omitted), or "potential danger to the public health or safety," Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC, No. 08-cv-442, 2014 WL 4723299, at *4 (S.D.N.Y. Sept. 23, 2014). These courts "have routinely dismissed trademark claims brought under Sections 349 and 350 as being outside the scope of the statutes, because ordinary trademark disputes do not pose a significant risk of harm to the public health or interest and are therefore not the type of deceptive conduct that the statutes were designed to

22

address." Kaplan, Inc. v. Yun, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014) (internal quotation marks omitted). One such court specifically held that even the potential that confused consumers may purchase an actually inferior product is insufficiently dangerous to make the practice "consumer-oriented" under these statutes. See Conopco Inc. v. Wells Enterprises, Inc., No. 14-cv-2223, 2015 WL 2330115, at *6 (S.D.N.Y. May 14, 2015).

However, the issue is ultimately a question of how New York courts (and especially, its highest court, the New York Court of Appeals) interpret Sections 349 and 350, and in the view of the undersigned, "the elevated requirements that some [federal] district courts have apparently engrafted onto the 'consumer-oriented' element of § 349 claims lack a basis in governing New York law" as interpreted by New York's own courts. Casper Sleep, Inc. v. Mitcham, 204 F. Supp. 3d 632, 643 (S.D.N.Y. 2016).[6] As the New York Court of Appeals has held, "These statutes on their face apply to virtually all economic activity, and their application

---

[6] See also Koch v. Greenberg, 626 Fed. Appx. 335, 340 (2d Cir. 2015) ("[G]iven that the defendant provided wine to be sold at auction to other consumers similarly situated to [plaintiff], the consumer-oriented conduct requirement has been met."); Casper Sleep, Inc. v. Derek Hales & Halesopolis LLC, No. 16-cv-03223, 2016 WL 6561386, at *8 (S.D.N.Y. Oct. 20, 2016); Stewart v. Riviana Foods Inc., No. 16-cv-6157, 2017 WL 4045952, at *8 (S.D.N.Y. Sept. 11, 2017); Kacocha v. Nestle Purina Petcare Co., No. 15-CV-5489 (KMK), 2016 WL 4367991, at *13 (S.D.N.Y. Aug. 12, 2016); In re Sling Media Slingbox Advert. Litig., 202 F. Supp. 3d 352, 359 (S.D.N.Y. 2016).

has been correspondingly broad." Karlin v. IVF Am., Inc., 712 N.E.2d 662, 665 (N.Y. 1999). New York courts distinguish not between minor economic harms and threats to public safety, but between disputes that are essentially between two parties, such as contract disputes, and "acts or practices [that] have a broader impact on consumers at large." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 647 N.E.2d 741, 744 (N.Y. 1995) In Oswego, for example, there was no great threat to health or safety: a bank allegedly did not adequately disclose that interest in savings accounts would not be paid on deposits in excess of $100,000. Id. What mattered was that the bank treated the plaintiff as they would any other consumer, not that this injury was incredibly grave.

Nonetheless, the Court will grant defendant's motion for summary judgment on these claims, as S'well has not shown that there is a genuine dispute as to whether the allegedly infringing ETS bottles are inferior to S'well Bottles. S'well points to deposition testimony that there have been complaints "from time to time" about customer misuse leading to leaks and the "imprint" on Force Bottles coming off. Safier Decl. Ex. 9, Deposition of Jennifer V. Campolini 13:22-15:12. Another employee testified that sometimes the products leak because a batch is badly made or because of customer error, but he could point to no specific instance. Penchina Decl. Ex. 3, Deposition of Robert James Derrig,

24

Jr. ("Derrig Dep.") 17:1-24. Putting aside hearsay problems, S'well has arguably shown in these instances that Force Bottles are not always perfect. But S'well adduces no evidence that S'well Bottles do not leak when misused or that their customized labels do not occasionally chip off. No reasonable juror could find that Force Bottles are an inferior product based only on this vague testimony and with no evidence of the comparative quality of S'well products.

S'well also points to the plastic Impact Bottle that ETS manufactures, which shares the same shape and cap as the S'well Bottle, but, unlike the S'well Bottle, is not made of stainless steel. S'well 56.1 Resp. ¶ 35. However, none of S'well's claims in its complaint involved the Impact Bottle, so the extent to which it is confusing is irrelevant. Moreover, no reasonable consumer purchasing plastic Impact Bottles will think she is purchasing a stainless steel S'well Bottle, nor will she infer that S'well's steel bottles are somehow worse simply because a plastic version exists. Such a consumer may think the Impact Bottle is somehow linked to S'well, but that consumer confusion is insufficiently consumer-oriented to state a claim under New York's deceptive practices and false advertising statutes.

Defendant's motion for summary judgment dismissing plaintiff's claims for violation of New York's deceptive acts and false advertising statutes is therefore granted.

## III. **False Designation and Unfair Competition under the Lanham Act (Second Cause of Action) and New York Common Law Unfair Competition (Fourth Cause of Action)**

As noted, ETS seeks summary judgment dismissing all of S'well's causes of action. By contrast, S'well has moved for summary judgment in its favor only as to liability and only on two of its claims against ETS: false designation and unfair competition under the Lanham Act (its second cause of action) and common law unfair competition (its fourth cause of action). The Court now turns to consideration of these competing motions as to these claims.

Section 43(a) of the Lanham Act makes liable, in relevant part, anyone who

> uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A). The standards for unfair competition claims under New York law are generally the same as those under the Lanham Act, with the additional element of bad faith. See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 538 (S.D.N.Y. 2011).

S'well contends that ETS has (1) misleadingly suggested to its customers that Force Bottles are a type of S'well Bottle, and (2) sold Force Bottles to customers who requested S'well Bottles without informing them of the difference. ETS, for its part, argues that neither claim meets the Lanham Act's "use in commerce" requirement and that there is insufficient evidence to show a genuine dispute on this requirement.

## A.   The "Use in Commerce" Requirement

The Second Circuit has held that the definition of "use in commerce" found in 15 U.S.C. § 1127 applies to all claims under the Lanham Act, including Section 43(a). See 1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, 407 (2d Cir. 2005). Section 1127 provides as follows:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce--
>
> **(1)** on goods when--
>
>> **(A)** it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>>
>> **(B)** the goods are sold or transported in commerce, and
>
> **(2)** on services when it is used or displayed in the sale or advertising of

27

services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

18 U.S.C. § 1127.

As noted, the Second Circuit in the 1-800 Contacts case, supra, held that the "use in commerce" requirement applies to all claims brought under the Lanham Act. This decision remains binding on this district court. However, it should be mentioned that a later panel of the Second Circuit engaged in an exhaustive (although non-binding) study of the history of the above-quoted provision and concluded that "Congress did not intend that this definition apply to the sections of the Lanham Act which define infringing conduct. The definition was rather intended to apply to the sections which used the phrase in prescribing eligibility for registration and for the Act's protections." Rescuecom Corp. v. Google Inc., 562 F.3d 123, 139 (2d Cir. 2009); see also 4 McCarthy on Trademarks and Unfair Competition § 23:11.50 (5th ed.) (arguing that Section 1127 "defines the kinds of 'use' needed to acquire registerable trademark rights — not to infringe them"). According to Rescuecom Corp., the "use in commerce" requirement clearly applied only to trademark registration, and any uncertainty on this score arose only because a 1962 amendment, which Congress itself described only as "rearrang[ing] the language," shuffled

some words around such that "use" and "in commerce," which had been in separate clauses, were now together in Section 1114. Rescuecom Corp., 562 F.3d at 135-37. Congress nowhere indicated that it intended to impose the restrictive definition of Section 1127 on those infringement claims. Id. at 137.

According to Rescuecom Corp., Congress's intent was made even clearer when it amended this section in 1988, adding the first sentence of the definition ("The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."). The Senate Report notes that this amendment was intended to "eliminate the commercially transparent practice of token use" and to "apply to all aspects of the trademark registration process." S. Rep. No. 100-515, at 45, as reprinted in 1988 U.S.C.C.A.N. 5577, 5608. "Clearly, however, use of any type will continue to be considered in an infringement action." Id. This is "clear" because Section 1127 does not apply to infringement actions – if it did, its limitation of "use in commerce" to "the bona fide use of a mark" would mean infringing conduct would never be "in commerce" under that definition.

Despite Congress's clear intent, even the court in Rescuecom Corp. refused to entirely reject the application of Section 1127 to infringement claims. Section 1127 states that its definitions apply "unless the contrary is plainly apparent from the context."

18 U.S.C. § 1127. Although the Rescuecom Corp. court recognized that "[i]t is easy to imagine perniciously confusing conduct involving another's mark which does not involve placement of the mark in the manner specified in the definition," it concluded that, "in spite of those doubts, one could not have said it was 'plainly apparent from the context' that those restrictions did not apply to sections defining infringement." Rescuecom Corp., 562 F.3d at 139. Because the Second Circuit prior to the 1988 amendments agreed with this conclusion, the Rescuecom Corp. court recommended applying the placement requirements of the definition to infringement claims, but not the "bona fide use" requirement. Id.; see also GoForIt Entm't, LLC v. DigiMedia.com L.P., 750 F. Supp. 2d 712, 726 (N.D. Tex. 2010) (adopting this approach).

In this Court's view, it was always "plainly apparent from context" that Section 1127 does not apply to infringement claims. Nevertheless, despite the confusion (in every sense) generated by the competing discussion in 1-800 Contacts and Rescuecom Corp., the Circuit has not overruled 1-800 Contacts and S'well has failed meet its requirements.

S'well argues that the use of a mark to promote other goods at the point of sale is sufficient to meet the "use in commerce" requirement, whether it is physically printed on something or not. But the "use" of a mark "in the sale" of a product falls under the definition of "use in commerce" for the sale of services, not

30

goods. S'well, as it must, relies principally on Ninth Circuit precedent, where courts are not bound by 1-800 Contacts. See Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250, 1255 (9th Cir. 1982).[7]

The only arguably "printed" version of the S'well mark is in ETS's Retail Brands Guide. See Penchina Decl. Ex. 26. But ETS's use of the mark in this guide is more akin to use "in the sale or advertising" of the product than it is to a sales display. Furthermore, no reasonable juror would find that this guide could confuse a distributor into thinking that the Force Bottle was a version of the S'well Bottle, as it clearly states that the two are simply similar, and the Guide contains dozens of other retail brands along with their ETS analogue.

Thus, even if ETS employees actually provided Force Bottles to distributors seeking S'well Bottles without informing them, and even if ETS representatives really did suggest in emails to distributors that Force Bottles were a type of S'well Bottle, ETS

---

[7] None of the cases from this Circuit that plaintiff cites supports its position. In Tiffany & Co. v. Costco Wholesale Corp., the mark in question was "in the display case signs [and] positioned on those signs where the brand manufacturer's name would generally be for other products." 127 F. Supp. 3d 241, 254-55 (S.D.N.Y. 2015). In Menashe v. V Secret Catalogue, Inc., the mark was printed in a catalog and on a website where you could purchase the goods. 409 F. Supp. 2d 412, 424 (S.D.N.Y. 2006). In C=Holdings B.V. v. Asiarim Corp., the mark was also used on a website where you could purchase the goods. 992 F. Supp. 2d 223, 240 (S.D.N.Y. 2013). In all three of these cases, the mark was "placed" on "displays" associated with the goods, and thus "used in commerce" under 15 U.S.C. § 1127.

31

nonetheless did not violate Section 43(a) of the Lanham Act because of an absence of applicable "use in commerce."

Because, regretfully, 1-800 Contacts remains binding on this Court, and because defendant's alleged use of plaintiff's mark was not "in commerce" under 15 U.S.C. § 1127, defendant's motion for summary judgment on plaintiff's second claim, for false designation and unfair competition under the Lanham Act, must be granted.

However, there is no reason to believe that New York courts would impose the same "use in commerce" limitation on common law unfair competition claims, including plaintiff's fourth cause of action. The limitation imposed by 1-800 Contacts arises from that court's misreading of the text of the Lanham Act, and there is no such statute at issue in New York. Instead, there is only the broad common law. As the Second Circuit has pointed out,

> New York courts have noted the "incalculable variety" of illegal practices falling within the unfair competition rubric, calling it a "broad and flexible doctrine" that depends "more upon the facts set forth than in most causes of action." It has been broadly described as encompassing "any form of commercial immorality," or simply as "endeavoring to reap where one has not sown"; it is taking "the skill, expenditures and labors of a competitor," and "misappropriating for the commercial advantage of one person a benefit or 'property' right belonging to another." The tort is adaptable and capacious.

Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc., 672 F.2d 1095, 1105 (2d Cir. 1982) (alterations and internal citations, all to New York courts, omitted).

Indeed, the New York Court of Appeals has specifically recognized that the common law of unfair competition reaches plaintiff's claims. "Palming off — that is, the sale of the goods of one manufacturer as those of another — was the first theory of unfair competition endorsed by New York courts, and has been extended to situations where the parties are not even in competition." ITC Ltd. v. Punchgini, Inc., 9 N.Y.3d 467, 476, 880 N.E.2d 852, 858 (2007) (internal quotation marks, citation, and alterations omitted). As that Court noted, "One of the most obvious forms of palming off occurs when the copier of an article overtly and explicitly misrepresents its source, for example, where a defendant substituted its product for plaintiff's when customers specifically asked for plaintiff's product." Id. at 858 n.2 (internal quotation marks, alterations, and citation omitted). That is exactly what plaintiff alleges ETS has done here.

Unfair competition claims under New York common law that otherwise resemble Lanham Act claims do not require that the allegedly infringing mark be "used in commerce" as defined by 18 U.S.C. § 1127. The Court therefore turns to what plaintiff's claim does require under New York law.

**B.  Validity of the Trademark and Likelihood of Confusion**

If the mark S'well seeks to protect is invalid, then ETS's alleged use of that mark is not unfair. "A trade mark to be valid as such, must be a distinguishing mark of the goods to which it is attached." Taylor v. Gillies, 59 N.Y. 331, 334 (1874). ETS suggests that the S'well mark has become generic, but puts forward no evidence, such as a consumer study, indicating that the public uses the words "S'well" or "Swell" to describe the specific shape of a bottle and does not connect the words to a specific source. ETS has not shown, therefore, that there is no genuine dispute as to the validity of S'well's mark.

New York courts in trademark cases also examine the eight Polaroid factors to determine whether there is a likelihood of confusion. See, e.g., George V Restauration S.A. v. Little Rest Twelve, Inc., 871 N.Y.S.2d 65, 67 (N.Y. App. Div. 2009). However, ETS is allegedly using S'well's exact mark – the word "S'well" – so, as with counterfeit claims, it is not necessary to perform the step-by-step examination of each Polaroid factor. Use of the exact same mark is inherently confusing. See Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp. 2d 448, 455 (S.D.N.Y. 2005).

As discussed above, the Force Bottles that customers ultimately receive are similar enough to make confusion likely post-receipt. Confusion is even more likely if, as plaintiff alleges, ETS has misled distributors into believing that they did

34

receive S'well Bottles, by either delivering Force Bottles when they ordered S'well Bottles or telling them that Force Bottles are a type of S'well Bottle. The question, then, is whether there is a genuine dispute as to whether or not ETS employees have actually used S'well's trademarked name in the manner alleged.

## C. Selling Force Bottles to Distributors Who Requested S'well Bottles; Bad Faith

S'well contends that the evidence shows that ETS salespeople regularly field orders from distributors for S'well bottles, fulfill those orders with Force Bottles, and never explain that the two are not the same. S'well points to multiple emails in which various distributors ask for "S'well" or "Swell" bottles and ETS employees, at least in the threads produced, do not clarify that they only sell Force Bottles. See Penchina Decl. Exs. 40-46.

ETS maintains that these requests were in fact for Force Bottles, and that, as Sharon Eyal, ETS's CEO, testified, "a lot of people call it just 'the S'well shape.'" Carwin Opp. Decl., Ex. 11, Deposition of Sharon Eyal 51:3-5. Sharon Eyal testified that they "try" to train their sales staff to correct customers who ask for S'well Bottles, but repeat customers consistently respond that they know they are getting the Force Bottle and are just referring to the shape, sometimes growing frustrated by being corrected. Id.

132:19-133:15.[8] After this litigation began, S'well employees were told that they must correct distributors asking for S'well Bottles. Penchina Decl. Ex. 47. That email describes itself as being a "gentle reminder," but there is some deposition testimony indicating that salespeople had not previously received this instruction. See Penchina Decl. Ex. 17, Deposition of Jeffrey Hinds 175:20-24.

One ETS salesperson testified that, if a distributor references S'well in an email and she responds discussing Force Bottles, she must have "had a conversation in person or on the phone that's not related in the e-mail, for example, that would have either clarified or I would have had knowledge that they're clear on what our bottle is." Carwin Opp. Decl., Ex. 10, Deposition of Cristina Ysselstein 18:13-19. Another employee similarly testified that repeat customers "get upset sometimes if you keep asking them to confirm what item they're looking for," saying things like, "'Dang it, Jen. You know what I'm looking for. Stop asking me. You know it's the Force.'" Carwin Opp. Decl., Ex. 7, Deposition of Jennifer Campolini 54:3-10.

---

[8] Though inadmissible to prove the truth of the matter asserted, this and similar testimony about what distributors told ETS employees is admissible to show defendant's good faith. See United States v. Certified Envtl. Servs., Inc., 753 F.3d 72, 89 (2d Cir. 2014) ("In this case, the proffered evidence was not offered for its truth but to show that the statements occurred and that, given their effect on the defendants' state of mind, they provided a good faith basis for the defendants' actions.").

The Court finds that a reasonable juror could find for either party on this evidence, making summary judgment inappropriate.

S'well has adduced evidence from which a reasonable juror could conclude ETS has passed off Force Bottles as S'well Bottles. In one email, a distributor requested that the salesperson requested S'well Bottles, and asked that ETS "try to get these exact brands and items!" Penchina Decl. Ex. 41. Another email involved an obviously new customer — she introduced herself in the initial email - who asked for a quote and sample of S'well Bottles. Penchina Decl. Ex. 44. The ETS employee never clarified that they sell Force Bottles, and after several exchanges and the passage of two weeks, the distributor again referred to S'well bottles. Id. This does not square with ETS's story that they corrected new customers who inquired about S'well Bottles. In fact, ETS provides no emails in which an ETS employee clarified that Force Bottles were not affiliated with S'well. ETS is therefore not entitled to summary judgment.

However, a reasonable juror could also find that these distributors generally used "S'well" to reference the shape of the desired bottles, not the brand. S'well argues elsewhere that participants in the market strongly associate the shape of S'well bottles with the S'well brand, supporting an inference that distributors would use "S'well" to refer to the shape, but know they will receive Force Bottles. Many of the emails to which

plaintiff points appear to be from repeat customers or plainly do not contain all the communications associated with the order. If a juror believes the testimony of S'well salespeople that their general practice was to correct new customers who asked for S'well Bottles, they may reasonably infer that the distributors who requested S'well branded bottles were corrected in separate emails or phone calls. Moreover, if the jury finds ETS employees' testimony credible, then they will conclude that the employees believed in good faith that distributors knew they were going to receive Force Bottles even when they used the word "S'well."

Credibility determinations are squarely the province of the jury. Anderson, 477 U.S. at 255. Because bad faith is a required element under New York law, and there exists a genuine factual dispute as to whether it was present or absent here, neither party is entitled to summary judgment on this claim.

**D.   Claiming That Force Bottles Are S'well Branded Bottles**

S'well also cites several emails in which it claims that ETS told customers that its Force Bottle is a version of the S'well Bottle specific to the promotional products market. Defendant argues that its employees were not communicating that Force Bottles are S'well-branded, only that the two are very similar, and that Force Bottles are sold mostly in the promotional space while S'well Bottles are sold mostly by retailers.

38

The first email chain is between a distributor and an ETS sales manager in which the distributor asks, referencing the Force Bottle, "What is the retail brand that looks like this?" and the manager responds, "The S'well bottle is the retail version of this bottle." Penchina Decl. Ex. 34. The distributor's question suggests that he knows the Force Bottle is not affiliated with "the retail brand," and that the Force Bottle just "looks like" the retail brand. A reasonable juror could therefore find that the employee meant to convey only that the Force Bottle is similar to the S'well Bottle, which is sold in retail stores.

Second is an email chain between Rob Derrig, the ETS accounts manager, and Dave Gephart, a potential distributor, with the subject line "Yeti and S'well." Penchina Decl. Ex. 35. The email chain appears to have originated with Derrig, suggesting he wrote the subject line. In the first email, Derrig tells Gephart that he understands Gephart was "looking for some information on our Polar and h2go force." Gephart responds by saying, "Another large computer company is VERY interested in S'Wells." Derrig then provides links to ETS products and says, "Below are links to our h2go force (S'well)." Id. In his deposition, Derrig said that he was "not meaning to identify it as a S'well product but as a S'well alternative." Derrig Dep. 100:20-101:3.

Third, plaintiff cites an email from Derrig to a distributor in which he references the price for their "force/S'well" bottle.

39

Penchina Decl. Ex. 58. Although there is no testimony about this email, ETS argues that Derrig again intended to communicate that the Force Bottle is a similar alternative to the S'well Bottle, not that the two are otherwise related. ETS 56.1 Resp. ¶ 63.

A genuine dispute remains as to whether these two ETS employees were actually claiming that Force Bottles were S'well-branded bottles or were simply similar in shape. Again, plaintiff's claim turns on the credibility of the ETS witnesses regarding what they meant to communicate in these emails. Both parties' summary judgment motions as to plaintiff's New York unfair competition claims are therefore denied.

## IV. Conclusion

For the reasons stated above, defendant's motion for summary judgment is granted dismissing plaintiff's second, fifth, and sixth causes of action (false designation of origin and unfair competition in violation of the Lanham Act, deceptive acts and practices in violation of New York General Business law § 349, and false advertising in violation of New York General Business Law § 350), but is otherwise denied, and plaintiff's motion for summary judgment is denied in its entirety. The Clerk of Court is ordered to close documents numbered 52 and 56 on the docket.

SO ORDERED.

Dated:   New York, NY
         January **15**, 2018          JED S. RAKOFF, U.S.D.J.